# Exhibit B

FILED DATE: 9/18/2023 7:18 PM    2023CH07696

FILED
9/18/2023 7:18 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023CH07696
Calendar, 12
24422592

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

CITY OF CHICAGO,

           *Plaintiff,*

    v.

KIA AMERICA, INC., KIA CORPORATION,
HYUNDAI MOTOR AMERICA and,
HYUNDAI MOTOR COMPANY,

           *Defendants.*

Case No. 2023 CH 07696

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff City of Chicago brings this action against Defendants Kia America, Inc. and Kia Corporation (collectively "Kia") and Hyundai Motor America and Hyundai Motor Company (collectively "Hyundai").

### INTRODUCTION

1.      Unlike the movies, hot-wiring vehicles is far harder than it appears—unless that vehicle was manufactured by Hyundai or Kia.

2.      For years, automakers Kia and Hyundai chose to forego (often simple) industry-standard, anti-theft technologies in many of their cars. As soon as people discovered their shortcomings, videos showing how to "hot-wire" these cars went viral on the Internet. Not surprisingly, thefts of Kia and Hyundai vehicles skyrocketed at record-setting rates in cities throughout the United States, including in Chicago. This rise in thefts led to a rise in reckless driving, motor vehicle accidents, violent crimes, injuries, and property damage.

3.      Unfortunately, this critical defect in Hyundai and Kia vehicles could have been easily prevented. Most car manufacturers in the United States began introducing engine

FILED DATE: 9/18/2023 7:18 PM    2023CH07696

immobilizers as standard anti-theft equipment over a decade ago. Essentially, an electronic engine immobilizer is a security technology that functions by requiring a smart key with a special chip that sends an encrypted signal to start the car. Unlike nearly every other major car manufacturer, however, Kia and Hyundai failed to install this critical anti-theft technology in most of the vehicles they sold in the United States between 2011 and 2022, all while touting their vehicles as having "advanced" safety features.

4.      Kia and Hyundai knew that engine immobilizers were effective at preventing car theft. Kia and Hyundai had the capability to provide immobilizers, as they were routinely installing them as standard equipment in vehicles sold outside the United States. Both companies also knew that failing to install immobilizers would increase crime and threaten public safety. Yet they failed to install them. Moreover, they failed to disclose this lack of anti-theft technology clearly and conspicuously to consumers.

5.      Kia's and Hyundai's unlawful and reckless actions have caused a car theft crisis. In 2022, more than 8,800 Kia and Hyundai vehicles were stolen in Chicago alone. This figure represented 41% of Chicago's car thefts, even though Kia and Hyundai vehicles made up just 7% of the vehicles. Unfortunately, that trend has continued into 2023 and does not appear to be slowing.

6.      The surge in thefts has hit Chicago especially hard—placing pedestrians, drivers, and bystanders in harm's way. This crime wave has also further stressed Chicago's law enforcement and emergency services. Chicago is bearing the cost of Defendants' unlawful conduct, as it pays for property damage, diverts law enforcement resources, and strives to keep the public safe from harm that Defendants could have prevented. Through this lawsuit, Chicago seeks to shift those costs back to Defendants and hold Defendants accountable for their

misrepresentations and material omissions to Chicago consumers.

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

## PARTIES

7.      Plaintiff City of Chicago is a municipal corporation and a home-rule unit organized and existing under the laws of the State of Illinois.[1]

8.      Defendant Hyundai Motor America is a manufacturer and distributor of motor vehicles under the Hyundai brand and is incorporated and headquartered in the state of California. Its headquarters is located at 10550 Talbert Avenue, Fountain Valley, California. Hyundai Motor America distributes, markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Hyundai brand vehicles through a network of over 800 dealers throughout the United States from its headquarters in California. On information and belief, Hyundai Motor America is directly and materially involved in the manufacture and design of vehicles and in developing and disseminating promotional and advertising materials for Hyundai vehicles to United States' consumers, including consumers in Chicago.

9.      Defendant Hyundai Motor Company is a South Korean corporation with its headquarters located at 12 Heolleung-ro, Yangjae-dong, Seocho-gu, Seoul, South Korea. Hyundai Motor Company owns Hyundai Motor America and owns a minority stake in Kia Corporation. On information and belief, Hyundai Motor Company is directly and materially involved in the manufacture and design of vehicles and in developing and disseminating promotional and advertising materials for Hyundai vehicles to United States' consumers, including consumers in Chicago.

---

[1]      Following an investigation, Kenneth J. Meyer, Commissioner for the City of Chicago Department of Business Affairs and Consumer Protection, determined that Defendants engaged in practices prohibited by Section 2-25-090 of the Municipal Code of Chicago ("MCC"), and subsequently requested that the City of Chicago Department of Law bring legal action against Defendants seeking all available relief.

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

10.     Defendant Kia America, Inc. is a manufacturer and distributor of new motor vehicles under the Kia brand and is incorporated and headquartered in the state of California. Its principal place of business is located at 111 Peters Canyon Road, Irvine, California. Kia America, Inc. markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Kia-brand vehicles through a network of over 700 dealers throughout the United States from its headquarters in California. On information and belief, Kia America, Inc. is directly and materially involved in the manufacture and design of vehicles and in developing and disseminating promotional and advertising materials for Kia vehicles to United States' consumers, including consumers in Chicago.

11.     Defendant Kia Corporation, formerly known as Kia Motors Corporation, is a South Korean corporation with its headquarters at 201-1 Naebang-dong; Seo-gu, Gwangju, South Korea. Kia Corporation is the parent company of Kia America, Inc. On information and belief, Kia Corporation is directly and materially involved in the manufacture and design of vehicles and in developing and disseminating promotional and advertising materials for Kia vehicles to United States' consumers, including consumers in Chicago.

**JURISDICTION AND VENUE**

12.     This Court has jurisdiction over this action pursuant to the Illinois Constitution, art. VI, § 9.

13.     This Court has personal jurisdiction over Kia and Hyundai because they transact business in Illinois, including in Cook County. 735 ILCS 5/2-209.

14.     Venue for this action is proper in the Circuit Court of Cook County because Kia and Hyundai do business in Cook County and some of the transactions out of which this action arose occurred in Cook County. 735 ILCS 5/2-101.

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

**FACTUAL ALLEGATIONS**

A.      **Hyundai and Kia Became Two of the Most Popular Vehicle Manufacturers in the United States by Touting Their Vehicles as Industry Leaders in Safety and Quality.**

15.      Hyundai started selling vehicles in the United States in 1986. Kia first began selling cars in the United States in 1992. Since that time Hyundai and Kia have grown into two of the most popular and recognizable car brands in the United States. From 2010 to 2022 Hyundai and Kia's car sales in the United States grew from 894,300 to 1,451,594.

16.      Hyundai Motor Company was initially a majority stakeholder in Kia, until it divested a portion of its interest in the 2000s. It now controls approximately one-third of Kia Corporation. However, Hyundai and Kia remain closely connected.

17.      As one example of those remaining close connections, Hyundai and Kia vehicles share many of the same component parts and are worked on by the same group of engineers at the Hyundai America Technical Center, Inc. ("HATCI"). HATCI is an authorized representative for Hyundai and Kia when dealing with the National Highway Traffic Safety Administration ("NHTSA"). Additionally, many Hyundai and Kia vehicles share the same underlying engineering, although they may differ in style and cosmetic touches. For this reason, when certain parts are recalled for Hyundai vehicles, they are often recalled for Kia vehicles as well.

18.      Both Hyundai and Kia also repeatedly advertised to consumers that their vehicles were high quality and included advanced safety features.

19.      In fact, a theme across advertising campaigns for both Kia and Hyundai vehicles manufactured from 2011 through 2022 was that Kia and Hyundai did not just meet industry quality and safety standards, but that they were industry leaders in quality and safety.[2] For

---

[2]      Kia Motors America, Inc., 2016 Kia Forte, available at https://www.auto-brochures.com/makes/Kia/Forte/Kia_US%20Forte_2016.pdf; Kia Motors America, Inc., 2019

FILED DATE: 9/18/2023 7:18 PM    2023CH07696

example, the 2014 Kia Sorento was advertised to be "equipped with advanced active and passive safety features designed to ensure your peace of mind by helping you stay in control."[3] Likewise, the 2012 Kia Forte was advertised to include "a comprehensive list of advanced safety systems" included as "standard equipment on every Forte."[4] Similarly, the 2019 Hyundai Tuscan was advertised to include "more standard safety features" and to be "equipped with a whole host of advanced safety features."[5]

20.     What these advertising and promotional materials failed to mention is that none of these vehicles included engine immobilizers as standard safety equipment, even though this anti-theft technology had become standard equipment in almost all other vehicles sold in the United States by 2011.

**B.     Hyundai and Kia Failed to Install Industry-Standard Engine Immobilizers.**

21.     In response to the growing problem of vehicle thefts in the early 1990s, automobile manufacturers began installing passive engine immobilizers. These devices make a car engine operable only if the correct key having coded information is used.

22.     Starting in the late 1990s, several jurisdictions began mandating all new passenger

---

Kia Forte, available at https://www.auto-brochures.com/makes/Kia/Forte/Kia_US%20Forte_2019.pdf ; Kia Motors, 2011 Kia Sorento, available at https://www.auto-brochures.com/makes/Kia/Sorento/Kia_US%20Sorento_2011.pdf; Kia Motors America, Inc., 2015 Kia Sorento, available at https://www.auto-brochures.com/makes/Kia/Sorento/Kia_US%20Sorento_2015.pdf; Auto Media, *2011 Hyundai Sonata commercial*, YouTube, https://www.youtube.com/watch?v=_Ur8LJjFmUc; Sales Event, *Watch 2018 Hyundai Tucson TV Commercial "Built right In"*, YouTube, https://www.youtube.com/watch?v=YH1iubvoJxY; Hyundai, Hyundai Veloster 2015 Owner Manual, available at https://manualzz.com/doc/60197837/hyundai-veloster-2015-owner-manual.
[3]     Kia Motors America, Inc., 2014 Kia Sorento, available at https://cdn.dealereprocess.org/cdn/brochures/kia/2014-sorento.pdf.
[4]     Kia Motors America, Inc., 2012 Kia Forte, available at https://www.auto-brochures.com/makes/Kia/Forte/Kia_US%20Forte_2012.pdf.
[5]     Hyundai, 2019 Hyundai Tucson, available at https://secure.viewer.zmags.com/publication/2f65b9a9#/2f65b9a9/8.

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

cars have electronic engine immobilizers installed, including the European Union, Canada, New Zealand, and Australia. By the 2010s, immobilizers had become standard equipment for almost every automobile manufacturer in the United States—except for Hyundai and Kia.



**Figure 1: Engine Immobilizers in US Vehicles**[6]

23.     Engine immobilizers became industry-standard equipment because, as research supports, they are effective in curbing vehicle thefts. For example, the Highway Loss Data Institute ("HLDI") found "that vehicle theft losses decreased significantly after factory-installed passive immobilizing antitheft devices were introduced."[7] One study confirmed that immobilizers lowered the overall rate of car theft by roughly 50% from 1995 to 2008.[8] By 2019, the annual rate of car thefts had fallen about 67% from its peak in 1991.

---

[6]     Highway Loss Data Institute, Vol. 38, Bulletin No. 28 (Dec. 2021) available at https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.

[7]     *Id.*

[8]     Jan C. van Ours and Ben Vollaard, *The Engine Immobilizer: A Non-Starter for Car Thieves*, 126 THE ECON. J. 593, 1264, 1283 (June 2013), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2202165.

FILED DATE: 9/18/2023 7:18 PM   2023CH07696



**Figure 2**[9]

24.     Kia and Hyundai were aware of the evidence and knew engine immobilizers were effective, too. For example, in 2007, Hyundai argued that its Azera—a luxury model, and one of few that included an immobilizer—should be exempt from another anti-theft regulation because the immobilizer was an equally if not more effective method of deterring and preventing theft. As part of the slew of evidence that Hyundai presented to NHTSA to support its request for an exemption, "Hyundai stated that the data shows a dramatic reduction of theft rates due to the introduction of devices substantially similar to the Hyundai immobilizer device." [10] Hyundai's pitch was convincing—NHTSA granted the exemption, finding that Hyundai "provided adequate reasons for its belief that the [immobilizer] will reduce and deter theft."[11]

25.     Despite knowing that engine immobilizers were effective, and decades of evidence supporting this conclusion, Kia and Hyundai nonetheless chose to only include the device on their luxury models. This was the case even though including engine immobilizers on

---

[9]      Greg Rosalsky, *Planet Money*, *Someone stole my truck. I got a crash course on the wild black market for stolen cars*, NPR (Aug. 23, 2022), https://www.npr.org/sections/money/2022/08/23/1118457271/someone-stole-my-truck-i-got-a-crash-course-on-the-wild-black-market-for-stolen-cars.
[10]     72 Fed. Reg. 39,662 (July 19, 2007).
[11]     *Id.*

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

all their models was not cost-prohibitive. Including the technology would only have cost

Hyundai and Kia a few hundred dollars per vehicle. Moreover, outside the U.S., both companies

routinely installed immobilizers in *all* models of vehicles sold in the European Union and

Canada.

26.     Kia manufactured and distributed the following automobile models without

engine immobilizers between 2011 and 2022:

- Forte (2011-2021)
- K5 (2021-2022)
- Optima (2011-2020)
- Rio (2011-2021); Sedona (2011-2021)
- Seltos (2021-2022); Soul (2011-2022)
- Sorento (2011-2022)
- Sportage (2011-2022)

27.     Hyundai manufactured and distributed the following automobile models without

engine immobilizers between 2011 and 2022:

- Accent (2011-2022)
- Elantra GT (2013-2020)
- Elantra Coupe (2013-2014)
- Elantra Touring (2011-2012)
- Genesis Coupe (2011-2014)
- Kona (2018-2022); Palisade (2020-2021)
- Santa Fe (2011-2022); Santa Fe Sport (2013-2018)
- Santa Fe XL (2019)
- Sonata (2011-2019)
- Tucson (2011-2022)
- Velostar (2012-2017, 2019-2021)
- Venue (2020-2021)
- Veracruz (2011-2012)

28.     Collectively, the automobiles listed in paragraphs 26-27 are referred to throughout

this Complaint as the "Defective Vehicles."

29.     Contradictory to Kia and Hyundai's representations that the Defective Vehicles

led the industry in quality and safety, these vehicles were measurably less safe than other

vehicles on the market because they were easily stolen. Once this fact was spread on social media, thefts of Defective Vehicles ran rampant across the country.

**C.** **Kia's and Hyundai's Failure to Include Engine Immobilizers in Defective Vehicles Caused a Theft Crisis in Chicago.**

30.     Pushing thousands of cars onto the market without immobilizers, and without disclosing this defect to customers, led to an all-too-predictable outcome: thefts of Defective Vehicles skyrocketed.

31.     Specifically, Kia and Hyundai thefts exploded in the summer of 2022 when social media users began posting "how-to" videos depicting how easy it was to steal the Defective Vehicles because they lacked engine immobilizers. Videos quickly went viral, showing how a thief need only remove the plastic cover (called a cowl) under the steering column and use a USB cable to start the stolen vehicle. This prompted a wave of teens and young adults, often dubbed the "Kia Boyz," to start filming themselves and others engaging in reckless driving and other criminal behavior after stealing Defective Vehicles. Soon, almost half of all cars stolen in many cities were a Kia or Hyundai.

32.     This theft crisis hit Chicago particularly hard. In August 2022, the Chicago Police Department's 15th District announced in a community advisory that, "vehicle theft is up an astounding 767% due to an emerging TikTok challenge."[12] In October 2022, Chicago set a new record—more than 3,100 vehicles were stolen, the most in any month in the past 20 years. By the year's end, Chicago had experienced a 55% increase in vehicle thefts—up more than any other city in the U.S.

33.     This rise in vehicle thefts is largely attributable to a massive surge in stolen Kias

---

[12]     Audrey Conklin, *TikTok car theft challenge: Chicago area sees 767% increase in Hyundai, Kia thefts*, N.Y. Post (Aug. 25, 2022), https://nypost.com/2022/08/25/chicago-area-sees-increase-in-hyundai-kia-thefts-due-to-tiktok/.

FILED DATE: 9/18/2023 7:18 PM     2023CH07696

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

and Hyundais. More than 500 Kias or Hyundais were reported stolen in the first half of 2022; over the second half, the number had skyrocketed to over 8,350. In December 2022 alone, Kias and Hyundais made up 60.9% of the 2,700-plus car thefts in Chicago that month.



**Figure 3**[13]                                 **Figure 4**[14]

34.    Although Kias and Hyundais only make up approximately 7% of the vehicles in Chicago, they accounted for 41% of stolen vehicles in 2022—a total of over 8,800 thefts. That amounts to about 11% of the City's 36,300 registered Kias and about 8% of the City's 53,500 Hyundais being stolen that year.

---

[13]    Elliot Ramos and Brad Edwards, *More than 7,000 Kias and Hyundais have been stolen in Chicago this year, hitting South and West sides the hardest*, CBS NEWS CHICAGO (Dec. 14, 2022), https://www.cbsnews.com/chicago/news/kia-hyundais-stolen-chicago/.
[14]    *Id.*

FILED DATE: 9/18/2023 7:18 PM   2023CH07696



**Figure 5**[15]

35.     Unfortunately, the thefts show no signs of slowing. In 2023, Kia and Hyundai vehicles have consistently accounted for more than 50% of vehicles stolen in the city. In January 2023, Kia and Hyundai vehicles accounted for 60.3% of all vehicles stolen in Chicago. In July 2023, Kia and Hyundai vehicles continued to account for 54.3% of all stolen vehicles, with over 1,300 Kia and Hyundai vehicles stolen that month alone.

36.     As detailed further below, the crimes do not end with the theft of these motor vehicles: the individuals responsible for these crimes often engage in further criminal misconduct that create public safety issues, including but not limited to reckless driving, additional armed robberies, and even deaths.

**D.      Defendants' Failure to Include Engine Immobilizers have Disproportionately Impacted Low-Income Chicago Residents.**

37.     Chicago's residents have been deeply impacted by the Kia and Hyundai theft crisis, whether or not they personally own the Defective Vehicles. Individual owners suffer financial harm when their Defective Vehicles are stolen, damaged, and vandalized. Victims of

---

[15]     *Car thefts are rising. Is a TikTok challenge to blame?*, USA Facts (Mar. 13, 2023), https://usafacts.org/data-projects/car-thefts.

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

vehicle theft have expressed frustration at the significant out-of-pocket costs and impacts on their daily lives. Even if theft victims are lucky enough to have their Kia or Hyundai recovered by police and returned, they are almost always ransacked, damaged, or totaled altogether. One Chicagoan even had her 2019 Kia Optima stolen twice in one day—after police found the car damaged, they took it to an auto repair shop, and it was stolen *again* later that day.[16]

38.     Another owner, a single mother, had her 2021 Kia Forte stolen in October 2022.[17] Police found the vehicle—trashed but not totaled—and repairs were anticipated to take until springtime to complete due to a backlog in replacement parts. She was left paying $1,500 per month out-of-pocket for a rental car since her insurance only covered 30 days. Meanwhile, she still owes Kia her $400 monthly payment, which Kia refused to budge on despite the circumstances.

39.     Because the Defective Vehicles are entry-level models and relatively low priced, the impact of the surge in car theft is being felt disproportionally among communities of moderate and low means. The Chicago neighborhoods hardest hit by the surge in Kia and Hyundai thefts—Austin, South Shore, and the West Side—are also some of the lowest-income areas in the City. These theft victims and their families are often reliant on that single vehicle and have fewer resources to pay for alternative transportation or repair a recovered vehicle. Because many rely on their vehicles to get to work, medical appointments, or fetch groceries for their kids, they risk losing their jobs and worse.

40.     Costs for repairing broken windows, steering columns, and other damage often

---

[16]     Ramos and Edwards, *supra*, n.16.
[17]     Tara Molina, *Chicago woman's Kia will be under repair until spring after being stolen, found -- and she's stuck with all the bills*, CBS NEWS CHICAGO (Dec. 16, 2022), https://www.cbsnews.com/chicago/news/chicago-kia-theft-insurance-bills/.

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

exceed $10,000. And even if Kia and Hyundai owners can afford those repairs, they are often delayed days or weeks because the raft of thefts has created a backlog for replacement parts.

41.     Even owners of Defective Vehicles who have been lucky enough not to have their cars stolen are suffering. As a result of the Kia and Hyundai theft crisis, major insurers including Allstate and Progressive now refuse to insure the models most susceptible to theft. Meanwhile owners with existing policies have seen insurance prices for their Kias and Hyundais increase by $200 per year, if not more.

42.     Kia and Hyundai marketed their vehicles as industry leaders in safety and quality, knowing they lacked industry-standard anti-theft equipment, and failed to clearly and conspicuously disclose that fact to Chicago consumers. Defendants had every reason to know that their vehicles could be easily stolen without engine immobilizers but omitted the material fact that their cars lacked industry-standard anti-theft technology. These unlawful misrepresentations and omissions have left thousands of Chicago's most vulnerable residents with unsafe and, in some cases, uninsurable vehicles.

**E.     Defendants' Failure to Include Immobilizers Drains the City's Law Enforcement and Emergency Response Resources and Imperils Public Safety.**

43.     Harms to individual owners are just the beginning. Cars operated by unauthorized persons are more likely to cause unreasonable risk of accident, personal injury, and death. When NHTSA promulgated the Federal Motor Vehicle Safety Standards ("FMVSS") in 1971, it included FMVSS 114, addressing theft protection. In promulgating the Federal Motor Vehicle and Safety Standard 114, NHTSA recognized that car theft has significant impacts on public safety, concluding that "stolen cars constitute a major hazard to life and limb on the highways."[18]

---

[18]     33 Fed. Reg. 6,471 (April 27, 1968), https://archives.federalregister.gov/issue_slice/1968/4/27/6469-6472.pdf#page=3.

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

44.     According to NHTSA, "evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[19] The NHTSA Administrator also concluded that "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety," by reducing both injuries and deaths to would-be car thieves, and by "protect[ing] the many innocent members of the public who are killed and injured by stolen cars each year."[20]

45.     Unfortunately, the reverse is also true. An *increase* in the incidence of automobile theft results in a substantial decrease in public safety. Car theft results in reckless driving, which poses a risk to both the operators of the stolen vehicles and any lawful users of the public thoroughfare who are unfortunate enough to cross paths with them. Thieves commonly use stolen vehicles to commit further crimes.

46.     The risks are even more heightened with the new wave of Kia and Hyundai car thefts. In contrast to car thefts where the object is to convert the stolen vehicles without being caught, Kia and Hyundai theft often involves teens and young adults who steal cars to post videos of themselves recklessly joyriding or using the cars to commit other crimes. The car thefts and associated videos often take place during busy hours of the day when roads are more congested. As a result, there is a higher likelihood of injury and even death.

47.     These risks are far from hypothetical. In February 2023, NHTSA reported that this new social media trend had already resulted in at least 14 car crashes and 8 fatalities.[21] Two

---

[19]     *Id*.
[20]     *Id*.
[21]     NHTSA Press Release, *Hyundai and Kia Launch Service Campaign to Prevent Theft of Millions of Vehicles Targeted by Social Media Challenge* (Feb. 14, 2023), https://www.nhtsa.gov/press-releases/hyundai-kia-campaign-prevent-vehicle-theft.

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

14-year-old boys were killed and another injured after they crashed a stolen Hyundai Sonata.[22] Pedestrians have also been killed by stolen Defective Vehicles. And victims of stolen Kia and Hyundai vehicles face violence when they try to confront culprits. One woman who intervened in a theft in progress was killed.[23]

48.     Chicago has been one of the cities hit hardest by this violence. According to the Chicago Police Department ("CPD"), criminals used stolen Hyundais in more than a dozen murders from October 2022 through January 2023.

49.     More recently, four people used a stolen Hyundai to commit a series of crimes that ended with the murder of CPD Officer Areanah Preston.[24]

50.     In April 2023, a 6-month-old was killed in Chicago after a stolen Hyundai blew through a red light at top speed and struck the pickup truck the baby's mom was driving.[25] The Hyundai thieves were 14 and 17 years old.

51.     In another incident, a stolen Hyundai burst into flames after slamming into the back of a city-owned sanitation truck around 10:45 am.[26] The vehicle was suspected to be

---

[22]     Dean Narciso and Zaria Johnson, *Two 14-year-old boys killed in overnight crash involving stolen car, another hospitalized*, THE COLUMBUS DISPATCH (July 25, 2023), https://www.dispatch.com/story/news/crime/2022/07/25/adult-and-juvenile-were-killed-crash-involving-stolen-car/10142235002/.

[23]     Michele Fiore, *13-year-old charged as adult in deadly Wauwatosa hit-and-run*, CBS 58 (Oct. 20, 2021), https://www.cbs58.com/news/13-year-old-charged-as-adult-in-deadly-wauwatosa-hit-and-run.

[24]     John Dodge, *Chicago Police Officer Areanah Preston murder: A timeline of the case*, CBS NEWS CHICAGO (May 10, 2023), www.cbsnews.com/chicago/news/chicago-police-officer-areanah-preston-murder-a-timeline-of-the-case/.

[25]     Cate Cauguiran, *Family seeks upgraded charges for 2 teens after baby killed in West Garfield Park stolen car crash*, ABC7 CHICAGO (Apr. 24, 2023), https://abc7chicago.com/cristian-uvidia-west-garfield-park-chicago-crash-kim-foxx/13181868/.

[26]     Mugo Odigwe and Andrew Ramos, *Car believed tied to at least one armed robbery crashes, catches fire in Lincoln Square; 4 in custody*, CBS NEWS CHICAGO (Dec. 12, 2022), https://www.cbsnews.com/chicago/news/armed-robberies-north-side/.

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

involved in a string of five armed robberies earlier that morning. One victim said she was walking to her car with her friends when several men got out of a car and demanded their purses at gunpoint. One of the robbers pistol-whipped Ms. Oszak in the face.

52.     On August 1, 2023, Chicago news outlets reported a rideshare driver was robbed at gunpoint, with shots fired and his vehicle stolen.[27] The stolen Hyundai Sonata was then reportedly used in at least eight armed robberies.

53.     As recent as August 7, 2023, it was reported that five incidents of armed robbery occurred using stolen Kias and Hyundais in just one night.[28]

54.     The Kia and Hyundai theft crisis has translated into heightened demands on the City of Chicago's police force and other public safety resources. Chicago has been left to combat the thefts, related crimes, and respond to property damage and injuries to the public. In addition to responding to and investigating thefts, Chicago will have to continue to expend resources on public awareness outreach, as well as bear the costs associated with increased rates of reckless driving, car accidents, and resulting fatalities.

55.     According to CPD Patrol Chief Brian McDermott, these stolen cars are continually being used at an alarming rate in violent crimes, including homicides. CPD is investing time and resources in getting theft prevention education and devices out to the community, including tracking tags and steering wheel locks. The City is also reimbursing

---

[27]     *Rideshare driver among 8 robbed by armed men in stolen Hyundai; shots fired*, CWB CHICAGO (Aug. 1, 2023), https://cwbchicago.com/2023/08/stolen-hyundai-used-eight-robberies-shots-fired-chicago-rideshare.html.
[28]     ABC7 Chicago Digital Team, *Chicago police: At least 5 victims targeted in North Side armed robbery spree*, ABC7 NEWS (Aug. 8,2023), https://abc7chicago.com/chicago-armed-robberies-robbery-crime-crimes/13616985/?ex_cid=TA_WLS_TW&taid=64d216dda74c5f0001789ba3&utm_campaign=trueAnthem%3A+Trending+Content&utm_medium=trueAnthem&utm_source=twitter

owners of the Defective Vehicles for the cost of GPS tracking devices for the cars, which assist with police investigations and recovery efforts.

56.     Despite the City's best efforts, without action from Defendants, Chicago has been unable, on its own, to abate the nuisance of the Kia and Hyundai theft crisis. The Kia and Hyundai theft crisis and the costs incurred by Chicago were foreseeable outcomes that Defendants could have prevented had they simply chosen to make the same investment as other manufacturers—and indeed the same one they made in overseas markets—and include engine immobilizers as standard equipment in the Defective Vehicles.

**E.     Defendants' Response to the Theft Crisis has been Woefully Inadequate.**

57.     To date, Defendants' responses have shown a continued prioritization of profits over safety. After Illinois Attorney General Kwame Raoul and 21 other state Attorneys General urged Kia and Hyundai to take "comprehensive action" over car thefts, the companies instead promised to provide wheel locks for municipalities to distribute and began rolling out "software updates," rather than recalling the vehicles to install engine immobilizers.

58.     Moreover, Kia and Hyundai failed to follow through on their promise to provide steering wheel locks to Chicago. CPD asked Hyundai to provide steering wheel locks that CPD could distribute to Hyundai owners in the City. Hyundai provided fewer than 20 locks by the end of 2022, resulting in churches and local businesses donating locks to CPD instead.

59.     In January 2023, Chicago's Police Superintendent sent letters to Hyundai and Kia explaining the ongoing public safety crisis caused by the thefts and asking the companies to help address it by recalling or installing immobilizers in the Defective Vehicles. Hyundai responded by asserting that their "software fix," discussed above, would remediate the problem going forward. But the software updates have failed to stymy the vehicle theft spree, as Hyundai promised.

FILED DATE: 9/18/2023 7:18 PM    2023CH07696

FILED DATE: 9/18/2023 7:18 PM    2023CH07696

60.     These band-aid solutions are too little, too late. The software update extends the length of the car alarm from 30 seconds to one minute and purportedly requires a key to be in the ignition to start the car. Hyundai notes that for its update to work, the consumer must lock their door with their key or the key fob button in order to set the factory alarm and activate the software's "ignition kill" feature.

61.     But these software updates' efficacy is untested in the real world. In fact, consumers who received the updates—which are still being rolled out—have already begun reporting that their Kia and Hyundai vehicles were stolen even *after* they received the software update. One owner had his 2020 Kia Optima stolen a mere fifteen hours after leaving the Kia dealership and receiving the update.[29] Police later found the vehicle, but it was totaled—the front end was smashed, rear window missing, steering column ripped apart, both airbags deployed, live ammunition in the center console, and, most notably, a USB port jammed into the steering column. A 2017 Hyundai Sonata owner had a similar experience.[30]

62.     As of July 2023, only approximately 15% of the eligible vehicles had received the software upgrade. Especially as thefts continue despite the software upgrades, consumers may be deterred from spending the time to visit a dealership to get the technology installed.

63.     Even if the software updates were rolled out widely, and proved effective, they come too late to prevent the ongoing nuisance that the Defective Vehicles created and the expenses that Chicago has incurred and continues to incur. Further, it is not clear that the update

---

[29]     Devin Bartolotta, *First case of Kia stolen after security software upgrade reported in New Orleans*, WWL NEWS (May 15, 2023), https://www.wwltv.com/article/news/crime/first-case-kia-stolen-after-security-software-upgrade-reported-new-orleans-sweeps-crime-local-news/289-c789eed8-bc46-4e0a-83fb-7489563300ce.

[30]     Dave D'Marko, *Hyundai, Kia owners report thefts despite software upgrade*, FOX4 KANSAS CITY NEWS (May 17, 2023), https://fox4kc.com/news/hyundai-kia-owners-report-thefts-despite-software-upgrade/.

FILED DATE: 9/18/2023 7:18 PM    2023CH07696

will cover all models, and for those not covered, Defendants are offering nothing more than wheel locks or rebates for already purchased wheel locks. The reality is that the software update and wheel locks are not slowing thefts in Chicago and thus do not address the harm caused by Defendants failing to include engine immobilizers as standard equipment.

64.     Kia's and Hyundai's software-based approach is yet another example of Defendants pursuing profits over safety. While less expensive than installing engine immobilizers, those savings come at the expense of efficacy and usability. Defendants have effectively passed safety costs on to Chicago, which is pouring resources into responding to thefts and associated crimes, educating the community, distributing anti-theft steering wheel locks, and reimbursing for GPS trackers installed on Defective Vehicles.

65.     Adding insult to injury, before all the negative publicity surrounding the theft crisis and prior to announcing the free software update, Hyundai tried to take advantage of the crisis it created by selling security kits for $170, plus the cost of installation. Defendants could have, and should have, initially included a fob-integrated engine immobilizer, consistent with the industry standard. Even after the Defective Vehicles were sold without this component, Defendants could have implemented a mandatory recall, as state Attorneys General have insisted. Instead, Hyundai chose to turn greater profits off the theft crisis it caused. Without Defendants taking more aggressive action to correct the problem they created, thefts of Kia and Hyundai vehicles have continued unabated.

**FIRST CAUSE OF ACTION**
**Violation of MCC 4-276-470**
**Deceptive Trade Practices**

66.     Chicago incorporates each preceding paragraph as though set forth fully.

67.     The acts and practices engaged in by Defendants, and described in this Complaint,

19

constitute deceptive business practices in violation of the Municipal Code of Chicago ("MCC") § 4-276-470.

68.     MCC § 4-276-470 states that a person may not "act, use or employ any deception, fraud, false pretense, false promise or misrepresentation, or to conceal, suppress or omit any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . or advertisement of any merchandise, whether or not any person has in fact been misled."

69.     Kia and Hyundai are persons as defined by MCC § 1-4-090(e), which includes "any natural individual, firm, trust, partnership, association, joint venture, corporation or other legal entity."

70.     Defendants engaged in trade and commerce in Chicago by advertising the Defective Vehicles to Chicago consumers, which thousands of Chicago consumers purchased. Hyundai and Kia knowingly and intentionally misrepresented and omitted material facts related to the quality, reliability, and safety of their vehicles to Chicago consumers.

71.     Defendants engaged in deceptive trade practices in violation of MCC § 4-726-470. Specifically, Defendants misrepresented that their vehicles lead the industry in quality and safety and included advanced safety features. Defendants failed to clearly and conspicuously disclose to consumers that the Defective Vehicles lacked an engine immobilizer.

72.     Defendants specifically placed profits ahead of the health and safety of others by intentionally omitting and concealing material facts about the Defective Vehicles' lack of engine immobilizer and the ease with which they can be stolen.

73.     Under MCC § 4-726-470 "[e]ach violation of this section shall be considered a separate and distinct offense and shall be regarded as being committed on each day on which

FILED DATE: 9/18/2023 7:18 PM    2023CH07696

such person shall continue or permit any such violation." Each day that Defendants engaged and/or engages in deceptive marketing of the Defective Vehicles and/or sold and/or sells a Defective Vehicle to a Chicago consumer constitutes a separate and distinct offense of MCC § 4-726-470.

74.     WHEREFORE, Chicago respectfully requests that this Court enter an order (a) awarding judgment in the Chicago's favor on its First Cause of Action; (b) declaring that Defendants have violated MCC § 4-276-470; (c) enjoining Defendants from engaging in further deceptive practices in violation of MCC § 4-276-470; (d) assessing Defendants fines of $2,000 for each offense under MCC § 4-276-470; (e) awarding Chicago its costs of investigation and suit, including reasonable attorneys' fees and costs, to the extent allowable; (f) awarding Chicago pre- and post-judgment interest, to the extent allowable; and (g) awarding such other, further, and different relief as this Court deems reasonable and just.

**SECOND CAUSE OF ACTION**
**Violation of MCC § 2-25-090**
**Deceptive Trade Practices**

75.     Chicago incorporates each preceding paragraph as though set forth fully.

76.     MCC § 2-25-090 prohibits "any act of consumer fraud, unfair method of competition, or deceptive practice while conducting any trade or business in the city," including "[a]ny conduct constituting an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act . . . or constituting a violation of any section of this Code relating to business operations or consumer protection."

77.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") makes unlawful, among other things, "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise,

misrepresentation or the concealment, suppression or omission of any material fact, with intent

that others rely upon the concealment, suppression or omission of such material fact, or the use

or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices

Act. " 815 ILCS 505/2.

78.     Section 2 of the Uniform Deceptive Trade Practices Act, 815 ILCS 510/2

provides that a person engages in a deceptive trade practice when, in the course of his or her

business, vocation, or occupation, the person "represents that goods or services are of a particular

standard, quality or grade" or "engages in any other conduct which similarly creates a likelihood

of confusion or misunderstanding." 815 ILCS 510/2.

79.     Defendants engaged in trade and commerce in Chicago by advertising the

Defective Vehicles to Chicago consumers, which thousands of Chicago consumers purchased.

80.     Defendants engaged in deceptive trade practices in violation of MCC § 2-25-090.

Specifically, Defendants misrepresented that their vehicles lead the industry in quality and safety

and included advanced safety features. Defendants failed to clearly and conspicuously disclose to

consumers that the Defective Vehicles lacked an engine immobilizer.

81.     Defendants specifically placed profits ahead of the health and safety of others by

intentionally omitting and concealing material facts about the Defective Vehicles' lack of engine

immobilizer and the ease with which they can be stolen.

82.     MCC § 2-25-090(g) provides that "[e]ach day that a violation continues shall

constitute a separate and distinct offense to which a separate fine shall apply." Each day that

Defendants engaged or engage in deceptive marketing of the Defective Vehicles and/or sold

and/or sell a Defective Vehicle to a Chicago consumer constitutes a separate and distinct offense

of MCC § 2-25-090.

22

FILED DATE: 9/18/2023 7:18 PM    2023CH07696

83.     WHEREFORE, Chicago respectfully requests that this Court enter an order (a) awarding judgment in the Chicago's favor on its Second Cause of Action; (b) declaring that Defendants have violated MCC § 2-25-090; (c) enjoining Defendants from engaging in further deceptive practices in violation of MCC § 2-25-090; (d) awarding restitution for impacted consumers; (e) ordering disgorgement of profits Defendants obtained through their unlawful deceptive practices; (f) assessing Defendants fines of $10,000 for each offense under MCC § 2-25-090; (g) awarding Chicago its costs of investigation and suit, including reasonable attorneys' fees and costs, to the extent allowable; (h) awarding Chicago pre- and post-judgment interest, to the extent allowable; and (i) awarding such other, further, and different relief as this Court deems reasonable and just.

### THIRD CAUSE OF ACTION
### Violation of MCC § 2-25-090
### Unfair Trade Practices

84.     Chicago incorporates each preceding paragraph as though set forth fully.

85.     MCC § 2-25-090 prohibits "any act of consumer fraud, unfair method of competition, or deceptive practice while conducting any trade or business in the city," including "[a]ny conduct constituting an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act . . . or constituting a violation of any section of this Code relating to business operations or consumer protection."

86.     The ICFA makes unlawful, among other things, "[u]nfair methods of competition and unfair or deceptive acts or practices . . . In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." 815 ILCS 505/2.

87.     In determining whether an act or practice is unfair, the Federal Trade Commission considers the following factors which have been adopted by Illinois Courts in interpreting the

FILED DATE: 9/18/2023 7:18 PM  2023CH07696

ICFA: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* at 418.

88.     Defendants engaged in unfair trade practices in violation of MCC § 2-25-090. Defendants conduct violates public policy and was immoral, unethical, oppressive, and unscrupulous. At the time of Defendants' advertising and sale of the Defective Vehicles, Defendants knew engine immobilizers were effective and that manufacturing and selling vehicles without this industry-standard technology made the Defective Vehicles unreasonably susceptible to theft and created an unreasonable risk to public safety.

89.     The public policy against the manufacture and sale of cars unreasonably susceptible to theft has been recognized by the NHTSA since the promulgation of the FMVSS in the 1970s and adopted as standard in the United States motor vehicle industry where nearly all vehicles produced by other manufacturers included engine immobilizers as standard equipment.

90.     Nevertheless, Defendants continued to manufacture and sell Defective Vehicles without industry-standard anti-theft equipment and obfuscated critical information regarding the Defective Vehicles, touting those vehicles as leaders in safety and quality. Defendants continued to market, distribute, and sell Defective Vehicles with deliberate and/or intentional disregard for making any warning, instruction, or other precaution to prevent injuries and/or theft and thereby showed complete indifference to and/or conscious disregard for the safety of others.

91.     The wave of thefts of Defective Vehicles in Chicago would have been prevented had Defendants included engine immobilizers.

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

92.     When thefts of Defective Vehicles spiked, Defendants also failed to take adequate action to both notify consumers of the increased risk and to remove these dangerous vehicles from the market.

93.     As a direct and foreseeable result of Defendants manufacturing and selling unreasonably dangerous vehicles, public safety in Chicago has been imperiled and Chicago has born the burden to mitigate the damage caused by Defendants actions.

94.     Defendants also caused substantial injury to consumers. Chicago consumers have been left with Defective Vehicles that are increasingly becoming uninsurable. If those vehicles are stolen, consumers—who are disproportionately low-income—are often stuck continuing to pay a car payment for a stolen or totaled vehicle and paying hundreds if not thousands of dollars to repair their vehicles once recovered.

95.     MCC § 2-25-090(g) provides that "[e]ach day that a violation continues shall constitute a separate and distinct offense to which a separate fine shall apply." Each day that Defendants engaged and/or engage in unfair trade practices in their selling and failure to warn of the dangers of Defective Vehicles and/or sold and/or sell a Defective Vehicle to a Chicago consumer constitutes a separate and distinct offense of MCC § 2-25-090.

96.     WHEREFORE, Chicago respectfully requests that this Court enter an order (a) awarding judgment in the Chicago's favor on its Third Cause of Action; (b) declaring that Defendants have violated MCC § 2-25-090; (c) enjoining Defendants from engaging in further unfair practices in violation of MCC § 2-25-090; (d) awarding restitution for impacted consumers; (e) ordering disgorgement of profits Defendants obtained through their unlawful unfair practices; (f) assessing Defendants fines of $10,000 for each offense under MCC § 2-25-090; (g) awarding Chicago its costs of investigation and suit, including reasonable attorneys' fees

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

and costs, to the extent allowable; (h) awarding Chicago pre- and post-judgment interest, to the extent allowable; and (i) awarding such other, further, and different relief as this Court deems reasonable and just.

### FOURTH CAUSE OF ACTION
### Public Nuisance

97.     Chicago incorporates each preceding paragraph as though set forth fully.

98.     At all times relevant to this litigation, Defendants have been the manufacturers, marketers, and/or distributors of the Defective Vehicles being stolen at record rates, and which are being used in the commission of other violent crimes in Chicago.

99.     By designing, manufacturing, and distributing Defective Vehicles, Defendants have created, contributed to, and maintained a public nuisance that unreasonably interferes with a right common to the public.

100.    Defendants knew or should have known that their unlawful conduct has a significant effect on public rights and endangers the safety of the public in Chicago.

101.    Defendants knew that engine immobilizers were effective at preventing theft and included them in vehicles Defendants sold outside the United States. It was foreseeable to Defendants that failing to include engine immobilizers in the Defective Vehicles would result in increased rates of theft of Defective Vehicles and increased costs to Chicago for responding to those thefts and related crimes.

102.    At minimum, Defendants knew or had reason to know that this interference with public safety was a substantially certain outcome of their conduct.

103.    By intentionally foregoing the installation of engine immobilizers in the Defective Vehicles, Defendants directly facilitated the rapid increase in vehicle theft and, with it, created a public nuisance in Chicago.

104.    Chicago and its residents have a common right to be free from conduct that interferes with the peaceful use of public streets, sidewalks, commerce, travel, and the quality of daily life.

105.    Defendants have endangered and harmed the public, undermined law enforcement efforts to deter vehicle theft, and otherwise diverted scarce law enforcement and first responder resources.

106.    Defendants' conduct has directly caused a severe disruption of the public welfare, order, and safety. Defendants' conduct is ongoing and continues to produce permanent and long-lasting damage.

107.    Defendants' conduct substantially interferes with the public's right to safe and reasonable access to public thoroughfares.

108.    Defendants' conduct has affected and continues to affect a substantial number of people within Chicago's community and is likely to continue causing significant harm.

109.    The nuisance created by Defendants' conduct is abatable.

110.    Defendants could have avoided this public nuisance by installing engine immobilizers at the time of manufacture. Defendants acted unreasonably in light of what conduct could be foreseen as a result of their conduct, and Defendants' conduct was a factual and proximate cause of the injuries, harm, and economic losses that Chicago has suffered and will continue to suffer.

111.    As a result of Defendants' conduct, Chicago has suffered and will continue to suffer economic damages, including significant expenditures for police, emergency, health, prosecution, and other services and costs to repair property damage and for public outreach. Chicago will continue to incur such damages until the nuisance is abated. These damages are

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

particular to Chicago and are different in kind and degree to the harms suffered by Illinois residents at large.

112.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence.

113.    WHEREFORE, Chicago respectfully requests that this Court enter an order (a) awarding judgment in the Chicago's favor on its Fourth Cause of Action; (b) requiring Defendants to abate the nuisance described herein and to deter and/or prevent the resumption of the nuisance; (c) awarding Chicago damages, including past, present, and future costs incurred by Plaintiff to abate the nuisance described in this Complaint, the amount to be proven at trial; (d) awarding Chicago reasonable attorneys' fees and costs, to the extent allowable; (e) awarding Chicago pre- and post-judgment interest, to the extent allowable; and (f) awarding such other, further, and different relief as this Court deems reasonable and just.

## FIFTH CAUSE OF ACTION
### Negligence

114.    Chicago incorporates each preceding paragraph as though set forth fully.

115.    At all times relevant to this litigation, Defendants had a duty to act as a reasonably careful person would act under the circumstances in the design, manufacture, and distribution of Defendants' products, including the duty to take all reasonable steps necessary to prevent the manufacture and/or sale of a product that was so unreasonably easy to steal.

116.    Defendants owed Chicago a duty to not expose the City or its residents to an unreasonable risk of harm. At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of foregoing installation of engine immobilizers in the Defective Vehicles and specifically, the increased risk

of vehicle theft and public harm.

117.    Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of an engine immobilizer in the Defective Vehicles could cause Chicago's injuries and thus created a dangerous and unreasonable risk of injury to Chicago. Defendants were therefore in the best position to protect Chicago against the foreseeable rise in the theft of Defective Vehicles.

118.    Nearly all cars sold in the United States from 2011 to 2022, besides Defendants' Defective Vehicles, were equipped with an engine immobilizer.

119.    As such, Defendants, by action and inaction, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, development, manufacture, testing, and distribution of their vehicles, in that Defendants manufactured and produced vehicles that fell below minimum, industry-standard security measures.

120.    Defendants are in control of the design, research, manufacture, testing, and distribution of the vehicles they distributed to authorized dealerships in Chicago.

121.    Defendants knew and/or should have known that it was foreseeable that Chicago would suffer injuries as a result of Defendants' failure to exercise reasonable care in the manufacturing and sale of Defendants' vehicles, particularly given Defendants' recognition as early as 2007 that engine immobilizers were an effective deterrent in preventing vehicle theft.

122.    Defendants acted unreasonably in light of what could be foreseen as a result of their conduct. Defendants' negligence helped to and did produce, and was a factual and proximate cause, of the injuries, harm, and economic losses that Chicago suffered, and will continue to suffer.

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

123.     Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

124.     Chicago's injuries, harms, and economic losses would not have occurred absent Defendants' negligent conduct as described herein.

125.     Defendants' conduct constituting reckless disregard of Chicago's rights, was committed and/or authorized by one or more officers, directors, or managing agents of Defendants, who acted on behalf of Defendants. Additionally, or in the alternative, one or more officers, directors, or managing agents of Defendants knew of the conduct constituting reckless disregard of Chicago's rights and adopted or approved that conduct after it occurred.

126.     As an actual and proximate result of Defendants' wrongful acts and omissions, Chicago has been injured and suffered economic damages and will continue to incur expenses in the future, as described herein, including but not limited to expending, diverting, and increasing resources to retrieve stolen cars, provide emergency medical services, and/or address property damage on public roads in Chicago.

127.     Chicago has incurred, and will continue to incur, expenditures over and above its ordinary public services.

128.     Defendants' willful, knowing, and reckless conduct, constituting reckless disregard of Chicago's rights, including the right to public safety.

129.     Chicago is without fault and injuries to Chicago and its residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the manufacturing and distribution of their vehicles.

130.     WHEREFORE, Chicago respectfully requests that this Court enter an order (a) awarding judgment in Chicago's favor on its Fifth Cause of Action; (b) awarding Chicago

damages as permitted by law, the amount to be proven at trial; (c) awarding Chicago reasonable attorneys' fees and costs, to the extent allowable; (d) awarding Chicago pre- and post-judgment interest, to the extent allowable; and (e) awarding such other, further, and different relief as this Court deems reasonable and just.

## SIXTH CAUSE OF ACTION
### Violation of MCC § 1-20-020

131.    Chicago incorporates each preceding paragraph as though set forth fully herein.

132.    MCC § 1-20-020 provides that "any person who causes the city or its agents to incur costs in order to provide services reasonably related to such person's violation of any federal, state, or local law, or such person's failure to correct conditions which violate any federal, state, or local law when such person was under a legal duty to do so, shall be liable to the city for those costs."

133.    MCC defines "costs" as:

> all costs of the city incurred in relation to the provision of services by the city or its agents, regardless of whether the city would have otherwise incurred those costs, including but not limited to wages and benefits of personnel involved in providing such services, reasonable costs of equipment used in the provision of such services, costs of materials expended in providing such services, costs of storing hazardous or any other materials recovered during the course of providing such services, or any other costs allocable to the provision of services.

MCC § 1-20-010.

134.    Chicago is also entitled to recover a penalty in an amount equal to the City's litigation and collection costs and attorneys' fees. MCC § 1-20-060.

135.    Defendants have acted in violation of federal, state, and local law by using deceptive and unfair trade practices in violation of MCC §§ 2-25-090 and 4-276-470; 815 ILCS 505/2 and 510/2; and 15 U.S.C. § 45. Defendants have also acted in violation of state common

FILED DATE: 9/18/2023 7:18 PM    2023CH07696

FILED DATE: 9/18/2023 7:18 PM    2023CH07696

law through their negligent manufacture and sale of Defective Vehicles and their cause or contribution to a public nuisance.

136.    The direct and proximate result of Defendants' violation of federal, state and/or local law was a wave of thefts of the Defective Vehicles, and the resulting costs to Chicago in responding to the wave of thefts and crimes and injuries associated with those thefts.

137.    Because of Defendants' unlawful actions, the City of Chicago has had to expend, and will continue to expend, considerable resources to mitigate the harms from thefts of these vehicles and related crimes. The City of Chicago has incurred and will continue in incur costs for police, emergency, health, prosecutions, corrections, youth rehabilitation, and other services as well as costs for repairing property damage, and public outreach.

138.    WHEREFORE, Chicago respectfully requests that this Court enter an order (a) awarding judgment in the Chicago's favor on its Sixth Cause of Action; (b) awarding Chicago costs it has incurred and will continue to incur due to Defendants violation of law as provided in MCC § 1-20-020, in the amount to be proven at trial; (c) awarding Chicago its costs of investigation and suit, including reasonable attorneys' fees and costs as a penalty under MCC § 1-20-020; (d) awarding Chicago pre- and post-judgment interest, to the extent allowable; and (e) awarding such other, further, and different relief as this Court deems reasonable and just.

## PRAYER FOR RELIEF

Plaintiff City of Chicago respectfully requests that the Court enter an order granting the following relief:

A.    Declaring that Defendants violated MCC § 2-25-090;

B.    Declaring that Defendants violated MCC § 4-276-470;

C.    Enjoining Defendants from engaging in further unfair and deceptive practices in

FILED DATE: 9/18/2023 7:18 PM  2023CH07696

violation of MCC § 2-25-090;

D.    Enjoining Defendants from engaging in further deceptive practices in violation of MCC § 4-276-470;

E.    Entering an injunction requiring Defendants to abate the nuisance described herein and to deter and/or prevent the resumption of the nuisance;

F.    Awarding restitution to impacted consumers due to Defendants unfair and deceptive practices in violation of MCC § 2-25-090;

G.    Disgorging Defendants of their profits obtained through unfair and deceptive practices in violation of MCC § 2-25-090;

H.    Assessing Defendants fines of $10,000 for each offense under MCC § 2-25-090;

I.    Assessing Defendants fines of $2,000 for each offense under MCC § 4-276-470;

J.    Awarding Chicago costs incurred from Defendants' conduct pursuant MCC § 1-20-060;

K.    Awarding Chicago past, present, and future costs to abate the nuisance described in this Complaint;

L.    Awarding Chicago all other damages permitted by law;

M.    Awarding Chicago its costs of investigation and suit, including reasonable attorneys' fees and costs as a penalty under MCC § 1-20-020;

N.    Awarding Chicago reasonable attorneys' fees and costs, to the extent allowable;

O.    Awarding Chicago pre- and post-judgment interest, to the extent allowable; and

P.    Awarding such other, further, and different relief as this Court deems reasonable and just.

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

**CITY OF CHICAGO**
**DEPARTMENT OF LAW**

Date: August 31, 2023

By: /s/ Lucy A. Prather

Stephen J. Kane
Lucy A. Prather
CITY OF CHICAGO DEPARTMENT OF LAW
AFFIRMATIVE LITIGATION DIVISION
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
Tel: 312.744.6934
Firm ID: 90909

David Mindell
Shantel Chapple Knowlton*
EDELSON PC
dmindell@edelson.com
schappleknowlton@edelson.com
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Firm ID: 62075

Eve-Lynn J. Rapp
EDELSON PC
erapp@edelson.com
2101 Pearl Street
Boulder, Colorado 80302
Tel: 720.741.0076

Jimmy Rock*
EDELSON PC
jrock@edelson.com
1255 Union Street NE, 7th Floor
Washington, DC 20002
Tel: 202.270.4777

*Pro Hac Vice Forthcoming*
*Attorneys for Plaintiff City of Chicago*

34

FILED DATE: 9/18/2023 7:18 PM   2023CH07696

**CERTIFICATE OF SERVICE**

I, Eve-Lynn J. Rapp, an attorney, hereby certify that on September 18, 2023, I caused the above and foregoing *Amended Complaint* to be served by transmitting such document via the Court's electronic filing system to all counsel of record.

<u>/s/ Eve-Lynn J. Rapp</u>